# NORTHWEST ECKINGTON IMPROVEMENT COMPANY *v.* CAMPBELL.

EQUITY PLEADING AND PRACTICE; EQUITY; DEEDS, CORRECTION OF; DECREES.

1. Where in an equity cause the answer denies the allegations of the bill, and the questions of fact are evenly balanced upon the bill and answer, and there are not sufficient circumstances established by the evidence to corroborate the testimony of the complainant, the bill should be dismissed.

2. Where it appears that a deed was intended by the parties to give effect to a previous written agreement between them, but that it is inconsistent with the terms of such agreement, there is a manifest equity to correct the error.

3. Where in an equity suit to cancel a deed by the complainants to the defendant, and for an accounting, it appeared that the deed was based wholly upon a prior written agreement between the parties, the effect of which was to make them partners in the development of the land embraced in the deed, the complainants furnishing the land and the defendant undertaking the erection of the houses, all to unite in using their credit to obtain money with which to build the houses and to pay off an existing encumbrance on the land, the final paragraph of the agreement providing that in return for the defendant's undertaking he was to become possessed of a one-third interest in the property,—it was *held* that the deed was given to secure the defendant in the performance by the complainants of the agreement, and that a decree of the lower court which dismissed the bill so far as it sought a cancelation of the deed and a reconveyance of the property, but directed an accounting between the parties respecting the affairs of the venture, should, instead, have declared the deed to be a conditional one, dependent upon the performance by the defendant of the agreement upon which it was based, leaving the question of whether it should be canceled to be determined upon the result of the accounting. (Mr. Justice McComas dissenting.)

No. 1660.    Submitted October 11, 1906.    Decided December 14, 1906.

HEARING on an appeal by the complainants from a decree of the Supreme Court of the District of Columbia dismissing a bill in equity in so far as it sought the cancelation of a deed, and referring the cause to the auditor for an accounting.

*Reversed.*

The COURT in the opinion stated the facts as follows:

The appellants, the Northwest Eckington Improvement Company, Samuel C. Redman, and T. Cushing Daniel, filed their bill against the appellee, Charles M. Campbell, to have an accounting relating to certain joint building operations that had been engaged in by all of the parties, to cancel all contracts between them relating to the lands and building transactions, and to cancel a certain conveyance made by the appellants to the appellee of an undivided one-third interest in and to the lands described. The several prayers are therefor, and for general relief.

The following facts are substantially undisputed: The land known as lot 35 in the subdivision of a tract called "Metropolis View," in the District of Columbia, and comprising about 10 acres, was owned by the Northwest Eckington Improvement Company under conveyances made in the year 1900. The company was incorporated for the purpose of buying, developing, and selling lands. The appellants Redman and Daniel, respectively president and secretary of said company, were the owners of the bulk of the stock therein,—substantially all of it,—and said corporation was organized merely for convenience in holding the said land.. They acted in all the negotiations and contracts with the appellee as the real owners and parties in interest; the name of the corporation being used formally only by reason of its legal title. The land at the time negotiations were begun between the parties was subject to a mortgage for about the sum of $32,000 in favor of one Eleonora T. Franz.

What the several interests of Redman and Daniel were, does not appear, but Daniel was apparently the principal owner, and

throughout the negotiations acted in the main for both.  Daniel and Redman were financially embarrassed and apprehensive of the foreclosure of the mortgage early in 1902, and on March 13, 1902, entered into the following agreement with Campbell:

Whereas T. C. Daniel and S. C. Redman, of Washington, District of Columbia, acting for themselves and the Northwest Eckington Improvement Company of the District of Columbia, a corporation incorporated under the laws of the State of Virginia, are owners of a certain tract of land in Northwest Eckington subject to trust, interest, and taxes, fully described by the plats and printed matter of the above company, consisting of 10½ acres more or less, desire to dispose of the same, they hereby agree with C. M. Campbell, of Washington, District of Columbia, in consideration of one dollar in hand paid by him and other valuable consideration, that if he will organize, or be instrumental in organizing, a company, even with the assistance of T. C. Daniel or others, for the purchase of said ground, and give the necessary time and attention to that end, they agree, in case his plans work out so that they accept the consideration said company offers for said ground, to give him a third of the amount they receive, whether of money, stock, or property; and that in the event of such sale or disposition of said property, he is to become possessed of an undivided one-third interest in the property.  In case less than the whole tract is sold, said Campbell is to become possessed of an undivided one-third interest in the amount sold. .

T. Cushing Daniel.     (Seal.)
Samuel C. Redman.      (Seal.)
C. M. Campbell.        (Seal.)
(Northwest Eckington Improvement Co.)     (Seal.)

Approved and accepted,
    Northwest Eckington Improvement Co., ·

S. C. Redman, Pres't.
T. C. Daniel, Secretary.

Campbell failed to perfect the organization of the purchasing company, or to effect any sale of the property, and the particular scheme was abandoned by mutual consent.

The parties continued their friendly relations, and on October 23, 1902, entered into the following new contract:

Whereas a contract was entered into March 13, 1902, between T. C. Daniel and S. C. Redman and the Northwest Eckington Improvement Company, a corporation, and C. M. Campbell, stipulating for the services of said Campbell, it is further agreed, while preserving to said Campbell any rights he may have under said contract, as follows:

1. In consideration of the services said Campbell has already performed and for the purpose of securing his further services and co-operation in the handling and improvement of said property, it is agreed to make certain extensions of the provisions of said contract.

2. It is now decided to release the Sanitary Dwellings Company, if necessary, from any obligations it may have assumed in regard to any agreement to purchase said property.

3. The said Daniel Redman and the Northwest Eckington Improvement Company have decided to improve and market said property, as fast as may be possible, by building houses thereon.

4. To this end they desire to utilize the skill of said Campbell as a builder and his assistance financially.

5. It is agreed by said Daniel, Redman, and the Northwest Eckington Improvement Company to employ said Campbell as a skilful builder in the erection of said houses, he to take charge of said work, with such assistance as the other parties to this contract may be able to furnish, and to pursue such work industriously and with all the ability and skill he can bring to the work.

6. In the borrowing of the money that may be needed in developing said enterprise he is to use his credit by joining the other parties to this contract in the making or indorsing of any notes that may be required in negotiating the necessary loans

for the making of said improvements and in paying off the loan of $32,000 now due on said property. In doing this, account is to be taken of all moneys and interest he has already advanced under contracts in relation to said property already entered into between the parties hereto. And any sums advanced or to be advanced by any of said parties for the same purpose under said agreements are likewise to be accounted for.

7. It is proposed to erect at once five houses on said property, and follow them with others as soon as such a course is warranted by the results and approved by the judgment of the parties to this agreement, said Campbell to industriously push said improvements with his best skill and ability, as provided in paragraph 5 herein, without any further compensation for his services than are provided for herein.

8. In return for said undertaking on said Campbell's part he is to become possessed of an undivided one-third interest in said property.

Witness our hands and seals this 23d day of October, 1902.

Northwest Eckington Improvement Co.,

By Samuel C. Redman, Pres.,
Thomas C. Daniel, Sec'y.
Samuel C. Redman.
T. C. Daniel.
C. M. Campbell.

At the time of the execution of this contract, Campbell, who was a builder of some experience, submitted to his associates in the enterprise the following memorandum giving his estimate of the probable results of the contemplated development:

*Five Houses:*

Annual and fixed charges .........................$2,992
Income ........................................ 2,400

Shortage ....................................... 592

*Ten houses:*

Charges ........................................$3,940

Income  .................................... 4,800

Surplus  .................................... 860

    Total charges per flat per mo. $16.50.

*Fifteen houses:*

Charges (Mrs. F. reduced to $24,500 at 6 per cent)....$4,887

Income  .................................... 7,200

Surplus  ....................................2,313

*Thirty houses:*

Charges (Mrs. F. reduced to $15,500 at 5 per cent)....$ 7,537

Income  .................................... 14,400

Surplus .................................... 6,863

*Forty houses:*

Charges (Mrs. F. reduced to $9,500 at 5 per cent)....$ 9,512

Income  .................................... 19,200

Surplus ....................................  9,688

    Total annual charges per flat per mo. $10.  Houses covering about ⅓ of the ground, or less.  Deterioration not allowed for. Perhaps taxes, insurance, and repairs on each row of 5 houses should in consequence be placed at $400 instead of $300.

*Disposal of first loan:*

To Mrs. Franz and back taxes ............$3,000

Five houses ........................... 9,250

Expenses of loan ...................... 250

                                 $12,500

*Cash and Loan acc't:*

Cost of five houses at $2,800.....................$14,000

Funds available ............................... 9,250

Shortage five houses ............................$4,750

*Annual charges on five houses:*

Interest on $27,500 Franz at 6 per cent $1,650
Taxes, insurance and repairs........   600
Interest on shortage loan ...........   440  (less back taxes)
Interest on trust ten houses ........ 1,250
                                        ─────
                                        $3,940

The erection of the first five houses under this agreement was begun some time late in the fall of 1902. By arrangement, the lots occupied by these houses were conveyed to Redman, Daniel, and Campbell on October 30, 1902, and a loan was then secured thereon for building purposes of $12,500. A portion of this was paid to the mortgagee, who released the lien upon the said lots, and the remainder was turned over to Campbell to be used in the construction of the houses. Thereafter a similar proceeding was had in regard to the construction of five additional houses. Campbell was expected to advance money in the construction of the houses, and apparently did make some advances. Apparently, also, Daniel's credit was used to some extent for the same purpose. Questions relating to these [matters] have been referred to the auditor for the taking of the account, and are incidentally mentioned here as constituting a part of the history of the transaction between the parties under the contract. It appears, also, that Campbell on December 2, 1902, entered into an obligation jointly with the other parties to pay the original indebtedness secured by mortgage upon the whole of the land.

It is apparent that the scheme of developing the property by building sanitary dwellings, or small apartment houses as they might be called, was suggested by the expected railway development near to the Eckington lands, in contemplation of certain acts, and another bill pending in Congress, which finally resulted in the acts for the building of the new Union Station, and consequent changes in the location of railway freight stations, tracks, etc. Respecting these improvements two acts of Congress relating thereto were approved February 12, 1901.

The new bill improving thereon and providing for the Union Station, pending in 1902, became a law on February 28, 1903.

As early as May, 1902, Campbell had issued a prospectus in aid of his scheme for organizing the Sanitary Buildings Company, in which this language, which he says Daniel assisted in, was used: "This company possesses about 10½ acres of ground contiguous to the immense improvements of the Pennsylvania and B. & O. Railway systems as shown on the accompanying map. This railroad expenditure, which has been estimated at $20,000,000, will bring a large number of families into this region, people with steady employment and good wages, who will want exactly this class of homes." It was also recited therein: "The company confidently offers this stock at par as an attractive and safe investment. It is believed by the officers that not less than 6 per cent will be earned from the date when the first forty houses are finished, and not less than 5 per cent from the date of subscriptions." This company is the one referred to in the contract of May 13, 1902, the organization of which was not perfected.

The act of February 28, 1903, then pending as a bill, made no substantial changes in the location as represented on the map. On January 16, 1903, at the request of Campbell, the Northwest Eckington Improvement Company, through Redman and Daniel, president and secretary respectively, executed a conveyance to Campbell of an undivided one-third interest in and to the tract of land before described. The following recital of consideration appears therein: "The said party of the first part (The N. W. E. Improvement Co.) for and in consideration of divers valuable considerations and the sum of $10  *  *  * to it in hand paid by the party of the second part (C. M. Campbell) the receipt of which," etc. is acknowledged. It is this conveyance which the complainants seek to cancel. During the year 1903, the parties began to have difficulties. No more money was available for buildings, some bills were unpaid, and nothing further was done.

The final act leading to this litigation occurred in this way: The part of the property adjacent to the railway tracks became

available for warehouse purposes, and on November 23, 1903, complainants, with the approval of Campbell, entered into a contract with one Malnati to convey to him a parcel of the land so situated, for the sum of $15,200.  Of this sum it was necessary to pay $6,000 on the mortgage to secure the necessary release.  When the sale was to be closed by deed, Campbell demanded one third of the surplus proceeds aforesaid, that is to say [about] $9,000.  Campbell claimed at the same time $4,000 as having been advanced by him in the erection of the houses before mentioned.  He had been called on to furnish an account of the money received and expended therein, and finally submitted a statement, some items of which, he admitted in giving testimony, he has found to be incorrect.  Campbell at first refused to join in the conveyance unless his demands were complied with; but an agreement was finally made and the deed executed.  The agreement as to the disposition of the proceeds of this sale is found in the following letter written by Daniel to J. T. Cull, who had the matter in hand, with the acceptance thereof, as follows:

January 7, 1904.

J. T. Cull, Esq.,
        Washington, D. C.
Dear Sir:—

In order that the sale negotiated by Mr. Antonio Malnati shall not fail by reason of the claims advanced by Mr. C. M. Campbell, I desire to advise you on behalf of the improvement company, Mr. S. C. Redman, and myself, for whom I am authorized to speak, that while reserving the right of contesting hereafter with Mr. Campbell the claims that he now advances with respect to the disposition of the money to be received from Mr. Malnati, and in no wise conceding any of said claims, you are authorized out of the purchase money to be received from Mr. Malnati to pay the taxes upon the property, $6,000 to the holders of the present first deed of trust, retaining $4,000 in your hands to await the settlement of the controversies which have arisen between Mr. Campbell and those for whom I speak,

and the balance, less the deposit already received by the improvement company shall be divided into three parts, one-third thereof you are authorized to pay over to Mr. Campbell, and the remaining two thirds to the Northwest Eckington Improvement Company.

(Signed)                              T. C. Daniel.

## *Accepted.*

Provided that the controversies above referred to shall be settled by mutual agreement within fifteen days from the date of delivery of vouchers in support of my claim for $4,000, in default of such settlement either party shall be at liberty to institute appropriate litigation in respect thereto, and that no deduction from the present payment to me shall be made on ac count of the deposit of $500.

(Signed)                              C. M. Campbell.
                                      T. C. Daniel.
                                      S. C. Redman,
                                      By T. C. Daniel.

Jan. 7, 1904.

All of these matters of difference were referred by the court below, in his decree, to the auditor, with instructions to take and report the account between the parties. By the same decree the prayer for the cancelation of the deed was refused, and that part of the decree is the subject of this appeal. The allegation of the bill to the effect that this deed was made to Campbell as a security for the performance of the contract, and not as an absolute deed to one third of the land, was met by Campbell in his answer as follows:

"It is true that after the failure of the sanitary company project, negotiations between complainants and defendant were resumed, and they finally resulted in the execution of the agreement dated October 23, 1902, but which was not executed and delivered until November 27, 1902.

"Under the agreement embodied in the said agreement of

March 13, 1902, as modified by the agreement of October 23, 1902, part of said land was conveyed and a loan obtained as set forth in paragraph 5 of the bill.

"The defendant admits that he has always claimed to be entitled to an absolute conveyance of one-third undivided interest in all the land owned by the corporation complainant.

"And he says that all the complainants fully recognized his right to such a conveyance, and it was duly authorized and executed, but he denies that said conveyance was made by way of security, and says that in consideration of defendant's undertaking set out in said agreements the said conveyance was made to carry absolute title to defendant. The defendant admits the conveyance and encumbrances of the second parcel as set forth in paragraph 5."

*Mr. J. H. Ralston, Mr. F. L. Siddons, Mr. W. E. Richardson,* and *Mr. Holmes Conrad* for the appellants.

*Mr. John Ridout* for the appellee.

Mr. Chief Justice SHEPARD delivered the opinion of the Court:

Daniel testified in support of the allegations of the bill, and was positively contradicted by Campbell, as indicated in his answer.

The burden being upon complainants to show that the deed did not express the intention of the parties at the time, the court below considered the question of fact as evenly balanced upon the bill and answer; and, being of the opinion that there were not sufficient circumstances established by the evidence to corroborate the evidence of Daniel, refused the relief prayed as to the deed, in accordance with the general rule in such cases laid down in *Vigel* v. *Hopp,* 104 U. S. 441, 26 L. ed. 765.

From that point of view the conclusion of the learned justice is a correct one, but we are constrained to differ from his

view of the weight of the circumstances surrounding the transaction.

At the time of the agreement of March 13, 1902, it is apparent that the complainants were apprehensive of the foreclosure of the mortgage on the land, concerning which they were in default; hence the liberal agreement with Campbell respecting the organization of a corporation for its purchase; Campbell, himself, entering into no binding obligation to accomplish the scheme.

Notwithstanding the failure of the scheme, the conditions of the property greatly improved during the year on account of the railroad development. The parties were agreed as to the reasonable prospect of building houses thereon and securing income therefrom. It was apparent that the cash value of the land had advanced considerably beyond the amount of the Franz mortgage, and apprehension of its loss by foreclosure was greatly, if not entirely, relieved. Complainants had no cash, and but little credit, for the improvement of the property, and believed that Campbell was not only a skilful builder, but also one who could render financial assistance.

Campbell submitted his estimates of the probable cost of the erection of as many as forty houses, and the probable income therefrom as indicating successful development in that way. The parties then entered into the contract of October 23, 1902.

The legal effect of this contract was to make the complainants partners with Campbell in the development of the land by building houses; they furnishing the land and Campbell undertaking the erection of the houses. All were to join in using their credit in obtaining money to erect houses, and pay off the $32,000 encumbrance; and the sums advanced by the respective parties were to be accounted for. Five houses were to be erected at once, to be followed by others if results were approved. The last paragraph of the agreement was that "in return for said undertaking on said Campbell's part he is to become possessed of an undivided one-third interest in said property." Clearly this did not contemplate that Campbell should at once

become the absolute owner of this one third of the land.    It was necessarily conditioned upon the terms of his undertaking, before recited in the contract.  He had no immediate right to demand a conveyance thereunder, and none when the deed was actually executed and delivered to him on January 16, 1903. Complainants contended that this deed was made, at Campbells request, to secure him in his rights under the contract. There is a conflict in the evidence relating to another matter in this connection.   Complainants say that Campbell submitted to them in July, 1903, another contract, which he requested them to sign, and upon Daniel's refusal carried it away.   When asked to produce this paper, on Daniel's examination as a witness, counsel for Campbell stated that [he] "being of the opinion that a paper not executed by the parties to this litigation is not competent evidence for any purpose, declines to produce it."   Daniel then testified as to its contents, saying that it was a verbatim copy of the contract of October 23, 1902, with the exception that it contained certain other paragraphs reciting that Campbell, having complied with his agreement, is entitled to a one-third interest in the property.   His reason for not signing the paper was that if signed it would relieve Campbell from all future responsibility in the whole transaction, and give a title before his undertaking had been carried out.   Campbell, when called there after as a witness on his own behalf, denied this statement, and produced an unsigned contract which he said that he had demanded the execution of December 10, 1902. He said that he then told Daniel that he had advanced too much money already without corresponding amounts having been advanced by him and Redman, and that he would decline to go ahead any further unless this contract or the deed itself was signed for his own one-third interest; in other words that he demanded this or the deed; but one or the other must be executed.  He then produced the alleged paper.  This first recites the contract of October 23, 1902, and then adds two additional paragraphs as follows:

"9. The said corporation party hereto agrees to execute at

once a conveyance of said undivided one-third interest to said Charles M. Campbell in fee simple.

"10. The said corporation party hereto agrees to indemnify the said Charles M. Campbell against all liability or loss of every nature, including counsel fees and expenses of litigation, which he may in any manner suffer, or incur for the benefit of said corporation under this agreement.

"The said T. Cushing Daniel and Samuel C. Redman hereby release the said Northwest Eckington Improvement Company and said Charles M. Campbell from all rights, interest, or claim which they claim or could claim under any former agreement."

Accepting Campbell's version of this transaction, and the paper as the true one, his statement is not calculated to impress us with the fairness of his purpose. This proposed contract went much farther than the deed which he demanded the execution of as an alternative. It not only contained a special indemnity clause for which there was no apparent reason, but also a clause releasing the Northwest Eckington Improvement Company and Campbell from all rights, interest, or claim which Daniel and Redman claim or could claim *under any former agreement.*

Under clause 9 he would have had the right to demand an immediate execution of the deed, and would thereby become invested with the absolute title to one third of the land under the legal title of the improvement company, and the equitable titles of Daniel and Redman discharged, possibly, from the obligation of the former contract, notwithstanding its re-recital, by the concluding paragraph before mentioned. If such a contract was in fact presented to Daniel and Redman, they were not only within their legal rights, but wise also, in refusing to sign it.

When the deed was executed, on January 16, 1903, it is not pretended that there was any new consideration for its execution. It was founded wholly upon the provisions of the contract of October 23, 1902, no matter what may have been the private opinion of the respective parties as to Campbell's rights

thereunder; and its meaning, purpose, and effect are determined thereby.

The difficulty attending the correction of a deed or instrument carrying into effect a previous parol agreement is obviated when it appears to have been prepared and executed in pursuance of a written agreement. When it appears that the instrument intended to give effect to a written agreement is inconsistent with its terms there is a manifest equity to correct the error. Adams, Eq. 169; *Elliott* v. *Sackett,* 108 U. S. 132, 141, 27 L. ed. 678, 681, 2 Sup. Ct. Rep. 375.

As before stated, there is nothing which tends to show that Campbell was to become the absolute owner of one third of the complainants' land without regard to the performance of the joint undertaking contemplated in the contract of October 23, 1902. It is true that contract is inartificial and somewhat vague, but no such meaning can be imputed to it.

In the light of the circumstances pointed out, we can come to no other conclusion than that complainants' statement of the purposes of this deed is the correct one. They represent it as given to secure Campbell in their performance of the contract. It was not a security, or an additional security, in the ordinary sense, but it did make Campbell secure, in the case of his endeavor to carry out that contract, by giving him at once the conveyance that he might thereafter become entitled to, and enabling him, by its registration, to give notice of his rights under the contract, to all persons who might thereafter acquire any interest from the complainants.

The decree, in so far as this conveyance is concerned, is interlocutory in its nature, and for the guidance of the auditor in stating the account between the parties, and, instead of virtually establishing it as an absolute deed, should have declared it to be merely a conditional one dependent upon the performance of the agreement in accordance with which it was made. The question whether it shall be canceled is a final one that can only be properly determined upon the coming in of the auditor's report with the account that has been ordered to be taken by him.

There is a mass of disconnected testimony relating to the money advanced by the parties, to which, as well as to that relating to the sale to Malnati, we have given no consideration, because it all relates to the subject-matter of the reference to the auditor. For the same reason we have not undertaken to determine whether there has been an actual breach of the agreement of October 23, 1902, by either party, or what are the rights of the parties respectively in the matter of the distribution of the proceeds of the sale to Malnati. It is sufficient for present purposes to say that complainants had no right to sell any part of the land without Campbell's consent, or to appropriate the entire proceeds to their own use, if at that time the joint contract for improving the lands was in full force, and had not been violated by Campbell, or abandoned by him without justification.

All these matters can be inquired into, and settled in the final hearing with the auditor's report.

Our conclusion is that so much of the decree as has been appealed from must be reversed, with costs, and vacated, and the cause remanded, with direction to enter a decree declaring the true intent and purpose of the deed of January 16, 1903, as indicated in this opinion.                               *Reversed.*